1
2
3
4                       UNITED STATES DISTRICT COURT
5                     NORTHERN DISTRICT OF CALIFORNIA
6

7   LINDA KING,                          Case No.  14-cv-02322-JSC

            Plaintiff,

8
9         v.                             **ORDER ON CROSS-MOTIONS FOR
                                         SUMMARY JUDGMENT**
10  CAROLYN W. COLVIN,
                                         Re: Dkt. Nos. 15, 18
            Defendant.

11

12

13        Plaintiff Linda Diane King[1] brings this action pursuant to 42 U.S.C. § 405(g), seeking

14  judicial review of a final decision by Defendant Carolyn W. Colvin, the Commissioner of the

15  Social Security Administration, denying Plaintiff's application for Supplemental Social Security

16  income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, 1383(f).  Both parties have

17  consented to the jurisdiction of the undersigned magistrate judge.  (Dkt. Nos. 9, 11.)  Now pending

18  before the Court is Plaintiff's motion for summary judgment and Defendant's cross-motion for

19  summary Judgment.  (Dkt. Nos. 15, 18.)  After carefully considering the parties' submissions, the

20  Court GRANTS Plaintiff's motion in part, DENIES Defendant's cross-motion, and REMANDS

21  for a new hearing consistent with this Order.

22                              **LEGAL STANDARD**

23        A claimant is considered "disabled" under the Social Security Act if she meets two

24  requirements.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

25  First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

26  reason of any medically determinable physical or mental impairment which can be expected to

27

28  _____
    [1] The medical record also refers to Linda Diane Nelson; as Plaintiff has explained, Nelson is her
    former surname, which became King upon marriage.  (AR 37.)

United States District Court
Northern District of California

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that she is unable to do her previous work and cannot, based on her age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining:

> (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work."

*Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

**PROCEDURAL HISTORY**

In October 2010, Plaintiff filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.[2] (AR 160-169.) Plaintiff alleged disability beginning August 16, 2002 caused by shoulder and knee pain. (AR 160, 233.)[3] Her claim was initially denied by the Social Security Administration ("SSA") on April 20, 2011, and on reconsideration on October 4, 2011. (AR 84-86, 88-92.) Plaintiff then filed a request for a hearing before an ALJ. (AR 93-95.)

On September 13, 2012, a hearing was held before ALJ Phillip Callis in Oakland, California, during which both Plaintiff and vocational expert ("VE") Judith Najarian testified.

[2] The ALJ noted that Plaintiff filed her application for SSI on September 28, 2010, but the application itself lists October 5, 2010 as the date of application. (*Compare* AR 23, *with* AR 160.) The difference in date is not material to the Court's analysis. In any event, the Court will use the October 2010 date.

[3] In their denials, the ALJ and SSA described Plaintiff as seeking disability based on shoulder and knee pain as well as depression. (AR 23, 88.) But Plaintiff's initial application alleged disability based on knee and shoulder pain. (AR 233.) In her statement following the hearing, Plaintiff contended that she was disabled due to "migraine headaches, foot pain, right knee pain, and right shoulder pain." (AR 272.) However, it appears that Plaintiff is only pursuing the physical disabilities now. (*See* AR 160, 233; *see generally* Dkt. No. 15.)

United States District Court
Northern District of California

1    (AR 35.)  The ALJ held the record open for another ten days to allow Plaintiff to submit additional

2    evidence.  (AR 34.)  On December 3, 2012, the ALJ issued a written decision denying Plaintiff's

3    application and finding that Plaintiff was not disabled within the meaning of the Social Security

4    Act and its regulations and, therefore, was not entitled to SSI benefits.  (AR 25-28.)  Plaintiff filed

5    a request for review, which the Appeals Council denied on March 24, 2014.  (AR 18-19, 1-6.)  On

6    May 19, 2014, Plaintiff initiated the present action, seeking judicial review of the SSA's disability

7    determination under 42 U.S.C. § 405(g).  (Dkt. No. 1.)

8                                    **FACTUAL BACKGROUND**

9           Plaintiff, who was 57 years old when she filed for disability, is a resident of California who

10   was homeless at the time of her initial application.  (AR 38, 221.)   She completed two years of

11   college and previously worked as a property manager for a real estate company from 1995 to

12   2001.  (AR 239, 312.)  From 2001 to 2002, Plaintiff worked at Bank of America as a personal

13   banker and substitute manager.  (AR 239, 274.)  In 2002, Plaintiff stopped working due to an

14   injury to her right knee, right shoulder, and right hand.  (AR 262.)  In 2005, she underwent

15   shoulder surgery.  (AR 259.)  From 2007 through 2011, Plaintiff worked twelve-hour days five

16   days a week as a home-based childcare provider for five children, ranging in age from an infant to

17   an 11-year-old.  (AR 41-43.)  She stopped in May 2011 after sustaining a fall, which caused her to

18   re-injure her shoulder and right knee.  (AR 43; *see also* AR 259, 262.)  Plaintiff underwent knee

19   surgery in 2011 and, at the time of the application, planned to have further shoulder surgery once

20   the knee had healed.  (AR 48-49, 266-267.)

21          In her initial application, Plaintiff alleged disability on the basis of shoulder and knee pain.

22   (AR 233.)  She stated that, among other things, her conditions limit her ability to move her arms,

23   get in and out of a bath, travel long distances, do repetitive tasks like using a computer, and climb

24   up or down stairs.  (AR 261.).  She reports difficulty in caring for her personal needs.  (AR 261,

25   269.)  Plaintiff's sleep is interrupted due to her condition, and because of her difficulty sleeping

26   she is tired throughout the day.  (AR 261, 266, 269.)

27

28

United States District Court
Northern District of California

3

**A.     Medical Evidence**

Plaintiff suffers from shoulder and knee pain.  During the relevant time period, Plaintiff has undergone several surgeries on her shoulder and knee, the first of which occurred in 2005. (AR 259.)  Plaintiff alleges that her shoulder and knee conditions have caused her to be disabled since August 16, 2002.  (AR 23, 88.)  As a result of her shoulder and knee pain, Plaintiff has seen a variety of physicians, surgeons, and primary care specialists to help cope with her symptoms.  A discussion of the relevant medical evidence follows.

1.     Plaintiff's Medical History & Evaluations

a.     *2002 through 2010 Medical History: Shoulder Surgery & Toe Problems*

The earliest records in the Administrative Record ("AR") date back to 2002, when Plaintiff visited Contra Costa Health Services ("CCHS") for outpatient treatment for right wrist tendonitis and right shoulder pain, as well as other unrelated symptoms including rectal bleeding, asthma, and IBS.  (AR 355.)  In April 2005 Plaintiff had arthroscopic surgery on her right shoulder to repair a torn rotator cuff.  (AR 361, 457, 458.)  Pathology tests on samples of cartilage taken from Plaintiff's shoulder were suggestive of degenerative joint disease.  (AR 408.)  Medical records from an October 2006 doctor's visit for flu symptoms also reflect the earlier-noted shoulder problems—specifically, pain from a right rotator cuff tear.  (AR 356-357.)  Plaintiff's medications during this period included Vicodin,[4] Tylenol 3, and Percocet[5] for shoulder pain, as well as Lomotil,[6] Clindamycin,[7] Cephalexin,[8] Albuterol,[9] Flonase,[10] for other conditions.  Records also

---

[4] Vicodin (acetaminophen and hydrocodone) is a narcotic pain reliever for moderate to severe pain. *Vicodin*, DRUGS.com, http:// www.drugs.com/vicodin.html (last visited Apr. 8, 2015).

[5] Percocet (acetaminophen and oxycodone) is a narcotic pain reliever for moderate to severe pain. *Percocet*, DRUGS.com, http://www.drugs.com/percocet.html (last visited Apr. 8, 2015).

[6] Lomotil (atropine and diphenoxylant) is an antidiarrheal medication.  *Lomotil*, DRUGS.com, http://www.drugs.com/mtm/lomotil.html (last visited Apr. 8, 2015).

[7] Clindamycin is an antibiotic used to treat serious bacterial infection.  *Clindamycin*, DRUGS.com, http://www.drugs.com/clindamycin.html (last visited Apr. 8, 2015).

[8] Cephalexin is an antibiotic used to treat bacterial infections.  *Cephalexin*, DRUGS.com, http://www.drugs.com/cephalexin.html (last visited Apr. 8, 2015).

[9] Albuterol is a bronchodilator that relaxes muscles in the airways and increase air flow to the

United States District Court
Northern District of California

United States District Court
Northern District of California

reflect that Plaintiff engaged in physical therapy starting in 2007 to address pain she was experiencing in that right shoulder, as well as her right knee and hand.  (AR 236, 387, 446-451.)

Over the next few years, Plaintiff made several trips to the CCHS Emergency Department.  (AR 237.)  In November 2008 she visited the Emergency Department after tripping and falling on her right knee and hand onto a hard surface, complaining of pain in the hand and knee and concerned that she broke her right kneecap.  (AR 442.)  A knee x-ray showed no fracture but a contusion and sprain.  (AR 443.)

In addition, aside from shoulder and knee pain, from August 2009 through April 2010, Plaintiff visited the Emergency Department several times complaining of pain and swelling to her left foot, particularly the great toe, after dropping a table on it.  (AR 290, 439-440.)  The treating physicians concluded that Plaintiff had fractured her toe (AR 290), which resulted in a "possible chronic deformity" and "persistent local pain[,]" as well tinea pedis, commonly known as Athlete's foot.[11]  (AR 292, 439.)  Plaintiff was referred to an orthopedist later in 2010 for her foot.  (*See* AR 380, 382, 384.)  The treating physician wrote that Plaintiff complained of pain and swelling in the toe; a physical exam indicated a limited active range of motion but no obvious swelling, while an x-ray showed "some subtle erosions in the juxtacortical position of the medical aspect of the [interphalangeal] joint[.]"  (AR 382.)

       b.    *2011 Through 2012 Medical History:  Knee Surgeries*

In May 2011, Plaintiff visited the West Oakland Health Council reporting that she had reinjured her right shoulder and right knee after slipping on wet tile.  (AR 311, 428, 433.)  Plaintiff reported taking Tylenol for her shoulder.  (*Id.*)  Treatment forms indicate Plaintiff's report that, one month prior, others had advised her to seek counseling for mental and emotional problems

---

lungs and is used to treat asthma.  *Albuterol*, DRUGS.com, http://www.drugs.com/albuterol.html (last visited Apr. 8, 2015).

[10] Flonase is a steroid nasal spray used to treat nasal symptoms such as congestion, sneezing, and runny nose caused by seasonal or year-round allergies.  *Flonase*, DRUGS.com, http://www.drugs.com/flonase.html (last visited Apr. 8, 2015).

[11] *See Athlete's foot*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000875.htm (last visited Apr. 8, 2015).

because she is "depressed from [her] circumstances[.]" (AR 312.)  According to records from that visit, Plaintiff also reported being unable to function or concentrate due to trouble sleeping because of shoulder and knee pain.  (*Id.*)  The treating physician's impression was that Plaintiff suffered from right shoulder arthritis and right knee arthritis, among other unrelated conditions. (AR 313.)

In August of 2011, Plaintiff returned to CCHS reporting right knee and right shoulder pain stemming from that May slip-and-fall.  (AR 378.)  The treating physician observed swelling and tenderness in both areas and suspected a ligament tear.  (*Id.*)  Several months later, in October 2011, Plaintiff saw orthopedic surgeon Dr. Jaison James at CCHS and reported further pain in her right shoulder and right knee.  (AR 433.)

In 2011 and 2012, Dr. James performed two surgeries on Plaintiff's right knee.  (*See* AR 39, 398.)  The first surgery occurred in November 2011.  (AR 394, 400.)  In treatment notes preceding the surgery, Dr. James indicated that Plaintiff was suffering from problems with both her knee and shoulder, but he indicated that "[p]rior to addressing the right shoulder, we will pursue fixing her right knee as this will allow for adequate healing for the right shoulder and avoid the need for crutch use during the postoperative period for the shoulder." (AR 435.)  Dr. James' pre-operative plan further noted that the knee surgery was "[t]o be followed by shoulder surgery after she has recovered from the right knee." (AR 436.)  Dr. James' post-operative diagnosis was "synovial hypertrophy"[12] of and multiple tears to the tissue of Plaintiff's right knee. (AR 401.)

In January 2012 at a post-operative check-up, Plaintiff reported persistent pain, difficulty flexing and extending her knee, and hearing popping and clicking sounds from the knee.  (AR 431.)  According to his treatment notes, Dr. James observed that Plaintiff had only a limited ability to extend and flex her knee and should only bear weight on it "as tolerated." (AR 430.)  Dr. James referred Plaintiff to regular physical therapy at CCHS focusing on decreasing pain and weakness

---

[12] Synovial hypertrophy is swelling of the soft tissue surrounding a joint. *See Synovial fluid*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/imagepages/19698.htm (last visited Apr. 9, 2015); *Hypertrophy*, MedicineNet.com, http://www.medicinenet.com/script/main/art.asp?articlekey=25464 (last visited Apr. 9, 2015).

United States District Court
Northern District of California

1    in Plaintiff's right knee and right shoulder.  (AR 432.)  During this time, Plaintiff also regularly

2    saw her for orthopedic check-ins.  (*See, e.g.*, AR 375-377.)  Records from March 2012 reflect that

3    Plaintiff still reported "persistent pain and weakness" in her knee.  (AR 429.)  Later that month,

4    Plaintiff reported to her physical therapist that she had difficulty lying down, walking, reaching,

5    and lifting due to pain, stiffness, numbness, and weakness in her knee and shoulder.  (AR 428.)

6    Plaintiff also reported that repetitive activities worsen her pain, which wakes her 4-5 times per

7    night every night.  (*Id.*)  By April of 2012, Plaintiff reported to Dr. James improvement in her

8    knee but "some pain with clicking at times[.]"  (AR 424.)  At a checkup in May 2012, Dr. James

9    noted that Plaintiff's knee was "improving nicely" despite occasional pain and weakness, and that

10    her right shoulder was "improving with physical therapy, slowly but surely."  (AR 422.)  Dr.

11    James' treatment plan noted that Plaintiff could bear weight on right knee "as tolerated[.]"  (*Id.*)

12    Despite her November 2011 surgery, ongoing physical therapy, and at-home exercise,

13    Plaintiff continued to report pain, swelling, and bruising of the knee throughout the first half of

14    2012.  (*See, e.g.*, AR 416, 418.)  In July 2012, months after her first arthroscopic knee surgery,

15    Plaintiff reported persistent knee pain, stiffness, swelling, and weakness, and an MRI identified a

16    Baker's cyst,[13] swelling, meniscus tears, and "arthritic changes" to the right knee.  (AR 389, 416-

17    417.)  Later that month, Dr. James performed a second arthroscopic surgery on Plaintiff's right

18    knee.  (AR 389, 417.)  Dr. James' post-operation notes indicate a diagnosis of multiple tears to the

19    tissue of and arthritis in the right knee. (AR 390.)

20    As part of follow-up from knee surgery, and also to check in on Plaintiff's shoulder, from

21    2011 to 2012 Plaintiff saw Dr. Alice Lin on multiple occasions.  (AR 368-374.)  Dr. Lin's

22    treatment notes reflect observations of knee swelling in between Plaintiff's surgeries.  (*See, e.g.*,

23    AR 371.)  An x-ray following Plaintiff's second knee surgery reflected osteophyte formation and

24    narrowing of the joint space in Plaintiff's right knee.[14]  (AR 407.)  Dr. Lin noted her impression

25

26    [13] "A Baker's cyst is a fluid-filled cyst that causes a bulge and a feeling of tightness behind your
knee.  The pain can get worse when you fully flex or extend your knee or when you're active."

27    *Baker's cyst*, MayoClinic, http://www.mayoclinic.org/diseases-conditions/bakers-cyst/basics/definition/con-20023332 (last visited Apr. 9, 2015).

28    [14] Osteophytes are bone spurs—small projections of bone—that "may make it painful to extend

that Plaintiff had degenerative joint disease in her right knee.  (*Id.*)

In addition, apart from Plaintiff's knee and shoulder problems, her medical records from 2012 also reflect that she was referred to a neurologist based on a recent history of TIA[15] and headaches.  (AR 363, 266, 368.)  The treating neurologist indicated that Plaintiff had a history of migraines, and also noted Plaintiff's reports of pain in her right shoulder and knee.  (AR 363-364.)  The neurology treatment notes also reflect Plaintiff's reports to her neurologist that shoulder and knee pain disrupted her sleep.  (*Id.*; AR 366.)

During this period, Plaintiff's medications included Tylenol, Lidocaine,[16] Hydrocodone,[17] and Naproxen[18] for knee and shoulder pain, as well as Albuterol, Benadryl, Lomotil, Flonase, Advair, Neurontin, Claritin, Actifed, Tessalon, Propranolol, Cortisone, Sumatriptan, Atropine-Phenobarbital-Scopolamine-Hyoscyamine, Clopidogrel, Plavix, Ambien, and Simvastatin for other conditions, including allergies, asthma, IBS, high blood pressure, and migraines.  (AR 395, 419, 428, 438.)

2.  Functional Capacity Evaluations

Apart from routine and emergency medical visits, Plaintiff underwent several examinations to measure her functional capacity in support of her application for disability benefits.  One of the evaluations was completed by examining physician Dr. Calvin Pon at the request of the SSA.  Two others were conducted by Drs. Chan and Wright, nonexamining state agency physicians who

---

and bend [the] leg" and "can get in the way of bones and tendons that keep [the] knee operating smoothly."  *Bone Spurs*, MayoClinic, http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/symptoms/con-20024478 (last visited Apr. 9, 2015).

[15] A TIA, short for "transient ischemic attack," occurs when blood flow to a part of the brain stops for a brief time; it is not a stroke, but a warning sign that a stroke my happen in the future.  *Transient Ischemic Attack*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000730.htm (last visited Apr. 8, 2015).

[16] Lidocaine is an injected local anesthetic.  *Lidocaine*, DRUGS.com, http://www.drugs.com/pro/lidocaine.html (last visited Apr. 10, 2015).

[17] Hydrocodone is an opioid pain medication.  *Hydrocodone*, DRUGS.com, http://www.drugs.com/hydrocodone.html (last visited Apr. 10, 2015).

[18] Naproxen is a non-steroidal anti-inflammatory drug used to treat pain or inflammation caused by conditions such as arthritis.  *Naproxen*, DRUGS.com, http://www.drugs.com/naproxen.html (last visited Apr. 10, 2015).

United States District Court
Northern District of California

1   reviewed the documentary evidence of Plaintiff's file.  Finally, two of Plaintiff's treating

2   physicians—Dr. Lin, her primary care physician, and Dr. James, her surgeon—completed

3   evaluations at Plaintiff's request.

4               a.   *Dr. Calvin Pon*

5       On January 10, 2011, Dr. Pon, a consultative medical examiner, met with Plaintiff and

6   conducted a consultative orthopedic disability examination.  (AR 297.)  Prior to the examination,

7   Dr. Pon reviewed Plaintiff's initial disability application.  (AR 295.)  At that time of the

8   examination, Plaintiff was 57 years old and complained of right shoulder plain, right knee pain,

9   and right ankle and foot pain.  (AR 295.)

10      Dr. Pon observed that Plaintiff walked without a cane or other aid in a stable gait without a

11  limp, albeit with "slightly less than normal" gait velocity and stride length.  (AR 296.)  He noted

12  that Plaintiff sat comfortably during the exam, was able to rise from the chair and stand normally,

13  and was able to squat about one-half of the way down but was limited by pain in her right knee.

14  (*Id.*)  Upon examining Plaintiff's right shoulder, Dr. Pon observed some limitation to Plaintiff's

15  ability to flex and abduct, limited by pain.  (*Id.*)  Dr. Pon also detected hypertrophy of the right

16  knee, but no crepitus.[19]  Dr. Pon opined that Plaintiff's chronic, residual right shoulder pain might

17  be due to degenerative changes following her operation.  (*Id.* at 297.)  He also found that

18  Plaintiff's chronic knee, ankle, and foot pain were probably due to degenerative arthritis.  (*Id.*)

19      In assessing Plaintiff's functional capacity, Dr. Pon stated:

20          The claimant should be able to stand and/or walk for a total of four
            to six hours during an eight-hour work day.  She should be able to
21          sit for a total of six hours during an eight-hour work day.  There is
            no restriction in stooping.  Crouching, kneeling, and squatting
22          should be limited to occasionally.  Climbing stairs and ladders and
            crawling should be limited to occasionally.
23
    (AR 297.)  Dr. Pon further found that despite her pain, Plaintiff "should still be able to perform
24
    pushing and pulling" with her right arm on a frequent basis.  (*Id.*)  Dr. Pon concluded that there
25
    was no restriction in performing pushing using her left leg, and that despite pain in the right knee,
26

27  _____
    [19] Crepitus, characterized by a peculiar cracking, crinkly, or grating feeling or sound under a joint,
28  may indicate cartilage wear in the joint space.  *See* Definition of Crepitus, MedicineNet.com,
    http://www.medicinenet.com/script/main/art.asp?articlekey=12061 (last visited Apr. 8, 2015).

9

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

ankle, and foot, Plaintiff should still be able to perform pushing with her right leg and foot on a frequent basis.  (*Id.*)  Dr. Pon's assessment continues:

> [Plaintiff] should be able to lift and carry 10 pounds frequently and 20 pounds occasionally.  There are no limitations in claimant's ability to perform reaching using her left shoulder.  Reaching using her right shoulder should be limited to occasionally, and there were some symptomatic limitations in active [range of movement] of her right shoulder[.]

(*Id.*)  Finally, Dr. Pon stated that there were no limitations to Plaintiff's ability to perform gross and fine manipulative tasks with both hands.  (*Id.*)

### b.   *Dr. Chan*

Consulting physician Dr. Chan completed a "Physical Residual Functional Capacity Assessment" form on February 4, 2011 on the SSA's behalf.  (AR 302.)  The form is a checklist, and although it provides an opportunity for comments, Dr. Chan did not provide any.  (*See* AR 298-302.)  Dr. Chan noted the following exertional limitations:  Plaintiff could only occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk and sit (with normal breaks) about 6 hours in an 8-hour workday; and, other than the lift and/or carry restrictions, could push and/or pull on an unlimited basis.  (AR 299.)  With respect to postural limitations, Dr. Chan determined that Plaintiff could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ladders, ropes, or scaffolds.  (AR 300.)  Dr. Chan further indicated that Plaintiff was limited in the ability to reach in all directions, including overhead, but had no other manipulative limitations.  (*Id.*)  Finally, Dr. Chan noted that she reviewed treating or examining source conclusions about Plaintiff's physical capacities, and the conclusions listed therein did not significantly differ from her findings.  (AR 302.)

### c.   *Dr. Jensine Wright*

Dr. Jensine Wright, another consulting physician, also completed a "Physical Residual Functional Capacity Assessment" form on August 1, 2011.  (AR 324.)  Dr. Wright's primary diagnosis was a tear to Plaintiff's right rotator cuff, and a secondary diagnosis of osteoarthritis in Plaintiff's right knee.  (AR 317.)  Dr. Wright noted most of the same exertional limitations as Dr. Chan:  Plaintiff could only occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10

pounds; stand and/or walk and sit (with normal breaks) about 6 hours in an 8-hour workday.  (AR 318.)  However, Dr. Wright determined that Plaintiff was limited in both the upper and lower extremities in her ability to push and/or pull due to her osteoarthritis and shoulder instability.[20] (*Id.*)

Dr. Wright reached the same conclusions as Dr. Chan with respect to postural and manipulative limitations:  Plaintiff could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; and was limited in the ability to reach in all directions, including overhead.  (AR 319-320.)  With respect to reaching, Dr. Wright included additional comment that Plaintiff's "[o]verhead reaching [was] limited to [occasional]" for the right upper extremity.  (AR 320.)  In addition, Dr. Wright included in her assessment a recommendation that Plaintiff avoid concentrated respiratory irritants in her environment due to her history of asthma.  (AR 321.)

Dr. Wright found that Plaintiff's allegations were "[o]verall credible[,]" but she concluded that the severity alleged "significantly exceed[s the] objective" findings of Plaintiff's treating physicians and consultative examiners.  (AR 322.)  Dr. Wright further explained the inconsistencies she highlighted.  For example, Dr. Wright noted that while Dr. Pon's report indicated that Plaintiff told him she might need another shoulder surgery, Dr. Wright concluded that "support is lacking" for that further surgery.  (AR 324.)  Dr. Wright also noted that while Plaintiff said that she has a cane, she did not bring a cane to the consultative examination.  (*Id.*)

           d.    *Dr. Alice Lin*

Dr. Alice Lin, a treating physician who had seen Plaintiff every 3 weeks since August 2011, completed a Residual Functional Capacity Questionnaire at Plaintiff's request in August 2012.  (AR 473.)  As far as diagnoses, Dr. Lin noted that Plaintiff suffered from a "right knee

---

[20] Specifically, Dr. Wright wrote that "RLE foot controls limited to frequent due to OA" and "RUE hand controls limited to frequent due to shoulder mdi."  Based on the form, "RLE" and "RUE" refer to right lower extremity and right upper extremity.  "OA" is a common abbreviation for osteoarthritis.  *See* Osteoarthritis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000423.htm (last visited Apr. 8, 2015).  "MDI" is multidirectional instability, a shoulder condition involving excessive mobility of the joint.  *See* Multidirectional Glenohumeral Instability, Medscape, http://emedicine.medscape.com/article/1262368-overview (last visited Apr. 8, 2015).

1    lateral meniscus tear, Baker's cyst, and degenerative joint disease" as shown by an MRI.  (*Id.*)

2    Due to her knee pain and instability, Dr. Lin indicated that Plaintiff could sit for about 4 hours and

3    stand/walk for about 2 hours in an 8-hour work day, and that Plaintiff would, on average, need to

4    take eight 30-minute rest breaks during an 8-hour work day due to pain and adverse effects of her

5    medication.  (AR 474.)  According to Dr. Lin, Plaintiff needs "a job that permits shifting positions

6    *at will* from sitting, standing or walking[.]"  (*Id.* (emphasis in original).)  Dr. Lin opined that

7    Plaintiff can frequently lift and carry less than 10 pounds, but due to her knee instability can never

8    lift and carry 10, 20, or 50 pounds.  (AR 475.)  Dr. Lin further noted that Plaintiff could never

9    twist, stoop (bend), crouch/squat, climb ladders, and could only rarely climb stairs.  (*Id.*)  Dr. Lin

10   concluded that Plaintiff was likely to be out of work about four days per month as a result of her

11   impairments or treatment.  (*Id.*)  According to Dr. Lin, these symptoms and limitations dated back

12   to October of 2011.  (*Id.*)

13            e.    *Dr. Jaison James*

14          Dr. James, who performed Plaintiff's two knee surgeries, completed a Surgeon

15   Questionnaire on Plaintiff's behalf in August 2012.  (AR 469-472.)  Dr. James indicated that

16   Plaintiff's right knee pain and patella instability caused joint dysfunction, gross anatomical

17   deformity, and instability of the right knee as indicated in an MRI.  (AR 469.)  Dr. James noted

18   that Plaintiff could flex her right knee to 105 degrees.  (AR 470.)  He reported that Plaintiff could

19   walk without the use of a hand-held assistive device, but could not walk one block at a reasonable

20   pace on rough or uneven surfaces.  (*Id.*)

21          With respect to Plaintiff's shoulder, Dr. James further noted that her range of motion was

22   limited on both abduction and flexion.  (*Id.*)  Dr. James did not indicate that he used any imaging

23   to reach his conclusions about Plaintiff's shoulder.  (AR 471.)  He noted that Plaintiff could

24   occasionally push or pull and do overhead work using her right arm, and could frequently perform

25   hand controls with her right hand.  (*Id.*)  Dr. James further opined that Plaintiff could only

26   occasionally perform leg controls—*i.e.*, apply repetitive force with the leg—and squat, and could

27   never kneel or crouch.  (*Id.*)  Like Dr. Lin, Dr. James estimated that Plaintiff was likely to be

28   absent from work as a result of her impairments or treatment more than four days a month.  (AR

United States District Court
Northern District of California

472.)  According to Dr. James, Plaintiff had been operating with the limitations he described for approximately one year.  (AR 472.)

        f.    *Psychological Evaluation*

On July 6, 2011, the SSA issued an authorization for psychologist April Young to complete a mental evaluation of Plaintiff later that month.  (AR 316.)  Plaintiff did not appear for the initially scheduled examination or the rescheduled appointment.  (AR 341.)  As a result, a consulting psychiatrist, reviewing Plaintiff's file at the SSA's request, determined that there was insufficient evidence to reach a medical disposition on Plaintiff's psychiatric condition.  (AR 329.)

**B.**    **The ALJ Hearing**

On September 13, 2012, Plaintiff appeared with counsel at her scheduled hearing before ALJ Phillip Callis in Oakland, California.  (AR 37.)  Plaintiff and VE Judith Najarian both testified at the hearing.  (*Id.*)

        1.    <u>Plaintiff's Testimony</u>

Plaintiff's testimony at the ALJ hearing was mostly limited to discussing her work history dating back to 1997.  At some point after 1997, Plaintiff worked as a substitute aide for special needs children in the West Contra Costa Unified School District.  (AR 53.)  After that, Plaintiff worked for six years as a property manager, which involved interviewing prospective tenants, scheduling work that needed to be done at the properties, collecting rents, and paying vendors. (AR 51.)  The property manager position involved a mix of onsite and offsite work.  (AR 61.) Plaintiff earned $150 to $200 per week at that job.  (AR 55.)  Plaintiff left the property management job to work as a "roaming substitute manager" for Bank of America for two years from 2001 through 2002.  (AR 49, 50, 52.)

For the four years leading up the hearing—*i.e.*, 2007 through May 2011—Plaintiff worked as a home-based childcare provider five days a week from 6:00 a.m. to 6:00 p.m.  (AR 41-42.) Plaintiff cared for five children ranging in age from an infant to 11 years old, and she sometimes had others assist her.  (AR 42-43.)  Her duties included making the children breakfast, driving all but the infant to school and picking them up from school, and preparing snacks and dinner in the evenings before the parents picked their children up.  (AR 44-45.)  If there was something heavy

United States District Court
Northern District of California

13

1    to lift related to her childcare duties, Plaintiff had someone else perform it for her.  (AR 48.)

2    Plaintiff's income for childcare depended on the family; however, she estimated that her yearly

3    gross income was about $36,000, but that she actually netted zero after deducting her expenses

4    and paying her taxes.  (AR 42-43.)

5           Plaintiff stopped working altogether in May of 2011 when she reinjured her shoulder and

6    right knee and could no longer lift the 30-pound infant she cared for and has not worked since.

7    (AR 47.)  Plaintiff has had two knee surgeries since that injury, and the doctors told her shoulder

8    surgery was necessary, too, and would be done after her knee stabilized.  (AR 48.)

9           2.    Vocational Expert's Testimony

10          At the ALJ's request, VE Judith Najarian, who reviewed Plaintiff's file and was present for

11   Plaintiff's testimony, testified to the classifications of Plaintiff's vocational history, identified the

12   exertional and skill levels of those jobs, and ultimately provided testimony as to whether Plaintiff

13   could perform that past relevant work.

14          The ALJ classified Plaintiff's Bank of America job as manager, financial institution

15   (DOT[21] 186.167-086, 1991 WL 671339), but noted that Plaintiff's description of her job duties

16   involved teller and vault work, including lifting in excess of 50 pounds on occasion.  (AR 58.)

17   The VE concluded that the Bank of America job was "medium [work] as performed, though there

18   may be points in time when she would be actually performing at heavy."  (*Id.*)  The VE classified

19   Plaintiff's childcare position as child monitor (DOT 301.677-010, 1991 WL 672652), which also

20   required performing at medium strength levels.  (AR 59.)  Finally, the VE classified Plaintiff's

21   property manager position (DOT 186.167-046, 1991 WL 671331), as involving light lifting as

22   described in the DOT, but medium as Plaintiff performed the job.  (AR 63.)

23          The ALJ then posed several hypotheticals to the VE to determine whether there were jobs

24   existing in significant numbers in the national economy that Plaintiff could perform given her

25   impairments.  The ALJ stated that he would begin with a hypothetical based on the Residual

26   Functional Capacity ("RFC") given by Disability Determination Services ("DDS") reviewers—

27

28   _____
     [21] Dictionary for Occupational Titles.

United States District Court
Northern District of California

1    i.e., Drs. Chan and Wright—which the ALJ determined "more or less follows what the internal

2    medicine CE [Dr. Pon] said." (AR 64.) This RFC asked the VE whether Plaintiff's past relevant

3    jobs were available to a person who is "limited to [lifting] 50 pounds occasionally, but only 10

4    pounds frequently[,]" who can "stand/walk six hours [and] sit six hours" in an 8-hour workday,

5    along with the following limitations:

6            Right lower extremity is foot controls are limited to frequent. Right
             upper extremity: hand controls limited to frequent. Occasional on
7            all postural activities, except no climbing of ladders, ropes,
             scaffolds. Overhead reaching is limited to occasional for the upper
8            right extremity. She is to avoid concentrated exposure to fumes,
             odors, other respiratory irritants.
9

10   (AR 64.)

11        The VE responded that Plaintiff could not perform her past child monitor position because

12   of the restriction that 10-pound lifting be limited to frequent, nor could she perform the financial

13   manager position or property manager position as she performed them, which involved medium-

14   strength lifting and carrying. (AR 64.) However, the VE noted that Plaintiff could perform the

15   financial manager or property manager positions as listed in the DOT, which involve less lifting

16   and carrying. (Id.)

17        In the second hypothetical, the ALJ included all of the limitations identified above, but

18   provided that the work is sedentary. (AR 65.) The VE responded that Plaintiff could perform the

19   financial manager position as the DOT described the position, but not as performed; and could not

20   perform the property manager or child monitor positions either as described or as performed. (AR

21   65.)

22        The ALJ also posed hypotheticals based on the RFC set forth in Dr. Lin's assessment.

23   (AR 65-66.) In the third hypothetical, the ALJ asked the VE what jobs a person could do "[i]f the

24   claimant was limited to only standing and walking two hours per day and sitting only four hours

25   per day, for a total of six hours—in other words, she could not consistently work an eight-hour

26   day[.]" (AR 66.) The VE responded that such person would not be employable in Plaintiff's past

27   relevant positions or any other jobs in the economy. (Id.)

28        In the fourth hypothetical, also based on Dr. Lin's assessment, the ALJ added the

United States District Court
Northern District of California

15

additional limitation that the claimant "has to take eight unscheduled breaks during the day, resting thirty minutes per break." (*Id.*)  The VE responded that such a person would not be employable either in Plaintiff's past relevant positions or otherwise in the economy. (*Id.*)  In a fifth hypothetical, the ALJ asked whether the claimant would be employable "[i]f she's absent more than two days a month on a consistent basis." (*Id.*)  The VE responded that she could not be employable either in her past relevant work or other jobs in the general economy. (*Id.*)

The ALJ asked the VE a sixth hypothetical based on the RFC assessment from Dr. Pon. Specifically, the ALJ inquired whether a person would be employable in Plaintiff's past relevant positions or otherwise in the economy with the following limitations:

> [Lift] 20 pounds occasionally, 10 pound frequently.   . . .
> [S]tand/walk four to six hours during an eight-hour day; sit six hours
> during an eight-hour day; crouching, kneeling, squatting, climbing
> stairs and ladders, and crawling should be limited to occasionally.
> . . . No restriction in stooping.  . . . [R]eaching using her right
> shoulder should be limited to occasional.

(AR 68-69.)  The VE responded that none of the prior relevant work would be available, as all involved frequent reaching. (AR 69.)

Next, the ALJ posed a slightly modified hypothetical to the VE.  He asked the VE "[i]f the reaching—if what Dr. [Pon] meant—and I don't know what he meant, frankly—if he was only limiting it to overhead reaching, would that still eliminate the financial manager position?" (AR 70.)  In other words, "[i]nstead of limiting all reaching to occasional with the right upper extremity, we're only limiting overhead reaching with the right upper extremity." (*Id.*)  The VE responded that under such conditions, the financial manager position and property manager positions would both be available. (AR 71.)

3.   Further Testimony

At the conclusion of the hearing, when asked if there were any further questions, Plaintiff's attorney stated that if the ALJ was "not crediting . . . the treating doctor's report, then . . . it would be appropriate to take testimony about . . . what the claimant's limitations are." (AR 72.)  The ALJ responded that there was no time left for further testimony but Plaintiff could request a supplemental hearing. (AR 73.)  Before concluding the hearing, the ALJ also noted that he would

16

leave the record open for one week to allow Plaintiff to submit further briefing or additional evidence.  (AR 74.)

On September 19, 2012, six days after the hearing, the ALJ issued Plaintiff a letter indicating that neither she nor her attorney had submitted additional evidence to date, and that they must do so within ten days of his letter.  (AR 34.)  As it happened, that same day Plaintiff's attorney submitted a letter to the ALJ along with two signed declarations from Plaintiff.  (AR 274-282.)  The first declaration explained Plaintiff's job duties as manager at Bank of America—in particular, that the "work involved significant counting of paper and coins, vault work, and direct interaction in customers[,]" and the second emphasized "how her prior Child Care position engendered virtually no net profit."  (AR 274-275.)

**C.     The ALJ's Findings**

In a December 3, 2012 written decision, the ALJ found Plaintiff not disabled under Section 1614(a)(3)(A) of the Social Security Act, taking into consideration the testimony and evidence, and using the SSA's five-step sequential evaluation process for determining disability.  (AR 23-28.)  *See* C.F.R. § 404.1520(a).

The ALJ essentially divided his analysis into two time periods.  First, the ALJ considered the period from the filing of the request for disability benefits (September 28, 2010) through May 2011, when Plaintiff was still working.  (*See* AR 25.)  For this time period, the ALJ concluded at step one that Plaintiff was not disabled because she engaged in substantial gainful activity.  (*Id.*)  *See* 20 C.F.R. § 404.1520(a), § 404.1571.  Specifically, he found that Plaintiff's five-day-a-week 12-hour-per-day job caring for children with reported gross earnings of $32,000 to $42,000 per year fell above the $1,640.00 monthly threshold for substantially gainful activity.  (AR 25.)

The ALJ separately considered the period after May 2011, when Plaintiff was no longer working.  (*See* AR 25.)  At step one, the ALJ concluded that because Plaintiff stopped working, she did not engage in substantial gainful activity during this time period.  (*Id.*)  At step two, the ALJ determined that the objective medical evidence indicates that Plaintiff's "status post right rotator cuff tear" and "osteoarthritis of the right kneecap" constitute "severe impairments" within the meaning of the regulations.  (*Id.*)  *See* 20 C.F.R. § 416.920(c).  At the third step, the ALJ

United States District Court
Northern District of California

1   concluded that Plaintiff did not have an impairment or a combination of impairments that meet or

2   medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

3   Appendix 1.  (*Id.*)  At this step, the ALJ considered whether Plaintiff's conditions met the listing

4   of Section 1.02, major joint dysfunction.  (*Id.*)  He concluded they did not on the grounds that

5   Plaintiff's medical records failed to demonstrate that she could not ambulate effectively and

6   demonstrated that she had unlimited use of at least one upper extremity.  (AR 25-26.)

7          The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform

8   light work except that she can only "occasionally climb ladders and stairs, but never ladders,

9   ropes, or scaffolds; she can occasionally crawl, crouch, kneel, stoop, and balance; she can

10  frequently push and pull and operate right arm/hand controls; she can push and use right leg/foot

11  controls frequently; she can occasionally reach overhead with her right arm."  (AR 26.)  At this

12  step, the ALJ noted that Plaintiff's impairments could reasonably be expected to cause the

13  symptoms she reported, but that her "statements concerning the intensity, persistence and limited

14  effects of these symptoms are not credible to the extent they are inconsistent with the" RFC the

15  ALJ reached.  (*Id.*)

16         To reach this conclusion, the ALJ gave great weight to the assessment of the DDS

17  reviewers, Drs. Chan and Wright, who were consulting physicians that the SSA hired, and whose

18  opinions the ALJ concluded were fully supported by Plaintiff's medical records.  (AR 27.)  In

19  particular, the ALJ gave great weight to the DDS reviewers' conclusion that Plaintiff would be

20  limited to overhead reaching, but not all reaching, with the right extremity.  (*Id.*)  The ALJ gave

21  significant weight to the assessment of consultative examiner Dr. Pon, which he found to be

22  generally consistent with the DDS reviewers' opinions except as to reaching: the ALJ wrote that

23  "[a]lthough Dr. Pon may have intended the same limitation to overhead reaching only, his

24  statement is less specific."  (*Id.*)  The ALJ also gave great weight to the DDS reviewers'

25  conclusion that Plaintiff could perform light exertion with her right knee, despite her knee

26  surgeries.  (*Id.*)

27         The ALJ gave "less weight" to the medical source statements of Drs. James and Lin,

28  Plaintiff's treating physicians, on the basis that there was no support in the record for these

United States District Court
Northern District of California

doctors' conclusions that Plaintiff could be expected to miss at least four days of work per month. (*Id.*)  The ALJ also noted that Dr. Lin "provides no support" for her opinion that Plaintiff would require unscheduled rest breaks.  (*Id.*)  Likewise, the ALJ rejected Dr. James' opinion that Plaintiff should never kneel or crouch, on the grounds that there was no support in the record for that limitation and it conflicted with Dr. Pon's observations of Plaintiff's stable gait and her ability to walk without a cane and comfortably sit and stand from the examination table.  (*Id.*)

At step four, the ALJ found that Plaintiff is capable of performing past relevant work as a bank manager or property manager as they are normally performed in the national economy.  (AR 28.)  Having determined that Plaintiff could perform her past relevant work, the ALJ found that Plaintiff was not disabled under the Social Security Act.  (AR 28.)

### STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the Court has authority to review an ALJ's decision to deny benefits.  When exercising this authority, however, the "Social Security Administration's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallenes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  The Ninth Circuit defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it is "more than a mere scintilla, but may be less than a preponderance."  *Molina*, 674 F.3d at 1110-11 (internal citations and quotation marks omitted); *Andrews*, 53 F.3d at 1039.  To determine whether the ALJ's decision is supported by substantial evidence, the reviewing court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (internal citations and quotation marks omitted); *see also Andrews*, 53 F.3d at 1039 ("To determine whether substantial evidence supports the ALJ's decision, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.").

Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are roles reserved for the ALJ.  *See Andrews*, 53 F.3d at 1039; *Magallenes*, 881 F.2d

at 750.  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and quotation marks omitted); *see also Batson v. Comm'r*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion.").  "The court may not engage in second-guessing."  *Tommasetti*, 533 F.3d at 1039.  "It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the Commissioner's determination as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, not the Court's, to resolve conflicts in the evidence."  *Bertrand v. Astrue*, No. 08-CV-00147-BAK, 2009 WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).

## DISCUSSION

Plaintiff challenges four aspects of the ALJ's decision.  The first three pertain to the ALJ's consideration of the medical evidence related to Plaintiff's alleged impairments: (1) the ALJ erred by rejecting the opinions of Plaintiff's treating and examining medical sources without contacting them for further clarification; (2) the ALJ failed to properly weigh the medical opinions insofar as he assigned one non-treating, non-examining doctor's opinion greater weight than those of two treating doctors, one examining doctor, and one other non-examining, non-treating doctor; and (3) the ALJ erred by failing to take testimony from a medical expert regarding Plaintiff's ability to ambulate effectively.  Lastly, Plaintiff maintains that the ALJ erred by utilizing Plaintiff's gross earnings instead of net earnings to evaluate whether her earnings from self-employment constituted substantial gainful activity.

**A.      Whether the ALJ's Consideration of the Medical Evidence was Error**

1.      The Standard for Weighing Medical Evidence

As a threshold matter, the ALJ must consider all medical opinion evidence.  *Tommasetti*, 533 F.3d at 1041 (citing 20 C.F.R. § 404.1527(b)).  However, in conjunction with the relevant regulations, the Ninth Circuit has "developed standards that guide [its] analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Specifically, a reviewing court must "distinguish among the opinions of three types of

20

physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  The opinion of each is accorded a different level of deference, as "the opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *see also Orn*, 495 F.3d at 631 ("Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." (citing 20 C.F.R. § 404.1527(d)(1)-(2))).  Courts afford medical opinions of a treating physician superior weight because these physicians are in a special position to know plaintiffs as individuals and the continuity of the treatment improves their ability to understand and assess an individual's medical concerns.  *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *see also Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual." (citation omitted)).  "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan*, 169 F.3d at 600 (citation omitted).

        "If a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(d)(2)).  If a treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence.[22]  *See*

---

[22] Although the Commissioner contends that the ALJ need only show "substantial evidence" for rejecting a medical source's opinion (Dkt. No .18 at 13), Ninth Circuit case law makes clear that while there must be "substantial evidence" to support the ALJ's ultimate disability determination, the ALJ must provide "clear and convincing" reasons for rejecting an uncontradicted opinion from a treating source.  *See Ryan*, 528 F.3d at 1198; *see also Chaudrey v. Astrue*, 688 F.3d 661, 670-71 (9th Cir. 2012); *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222 (9th Cir. 2010).

1    *Ryan*, 528 F.3d at 1198; *see also Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th

2    Cir. 2009) (same).  If a treating physician's opinion is not given 'controlling weight' because it is

3    not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the

4    ALJ must provide "specific and legitimate reasons that are supported by substantial evidence" for

5    rejecting it, *Orn*, 495 F.3d at 632, and in doing so, the ALJ must consider "specified factors in

6    determining the weight it will be given" to the treating physician's opinion.  *Ryan*, 528 F.3d at

7    1198.  "Those factors include the '[l]ength of the treatment relationship and the frequency of

8    examination' by the treating physician; and the 'nature and extent of the treatment relationship'

9    between the patient and the treating physician."  *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

> Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the [Social Security] Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record.

15   *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

16       Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it

17   still is entitled to deference.  *See id.* at 632 (citation omitted).  Indeed, "[i]n many cases, a treating

18   source's medical opinion will be entitled to the greatest weight and should be adopted, even if it

19   does not meet the test for controlling weight."  *Id.* (citation omitted).

20       Opinions of non-examining doctors alone cannot provide substantial evidence to justify

21   rejecting either a treating or examining physician's opinion.  *See Morgan*, 169 F.3d at 602.  An

22   ALJ may rely partially on the statements of non-examining doctors to the extent that independent

23   evidence in the record supports those statements.  *Id.*  Moreover, the "weight afforded a non-

24   examining physician's testimony depends 'on the degree to which they provide supporting

25   explanations for their opinions.'"  *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R.

26   § 404.1527(d)(3)).

27       At bottom, to meet its burden of providing specific and legitimate reasons to reject a

28   treating physician's opinion, the ALJ must "set[ ] out a detailed and thorough summary of the

United States District Court
Northern District of California

facts and conflicting medical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986).  In contrast,

> [w]hen an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion.

*Garrison*, 795 F.3d at 1012-13 (internal citation omitted).

Notably, "[i]f the ALJ thought he needed to know [more about] the basis of [the doctor's] opinions in order to evaluate them, he ha[s] a duty to conduct an appropriate inquiry, for example, by subpoenaing the physician[ ] or submitting further questions to [him]." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).  Thus, an ALJ also errs when he rejects a medical opinion as conclusory, unsupported, or ambiguous without fulfilling this duty.  *See, e.g.*, *Held v. Colvin*, No. 13-cv-05803-NC, 2015 WL 926272, at *5-6 (N.D. Cal. Mar. 2, 2015) (remanding based on the ALJ's error in rejecting a treating physician's opinion on the ground that the physician's opinion was not sufficiently explained or supported, where the ALJ did not inquire further into the basis of the physician's opinion); *Kruger v. Colvin*, No. C-12-5820 EMC, 2013 WL 4647340, at *4 (N.D. Cal. Aug. 29, 2013) ("Given the ambiguity with respect to the opinion of [a physician], the ALJ should have contacted [the physician] for clarification." (citations omitted)).

      2.   <u>Analysis</u>

          a.   *The ALJ Did Not Err by Failing to Recontact Plaintiff's Treating Physicians*

Plaintiff first contends that the ALJ erred by rejecting the opinions of treating physicians Drs. James and Lin for lack of support without developing the record further by contacting them for further explanation of their opinions.  (Dkt. No. 15 at 11.)

When an ALJ determines that there is insufficient support in the record to make a determination regarding whether a claimant is disabled, regulations impose a duty to further inquire.  Specifically, Social Security regulations provide in relevant part:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

> Recontacting medical sources.  When the evidence we receive from your treating physician or psychologist or other medical source is *inadequate* for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.
>
> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a *conflict or ambiguity* that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

20 C.F.R. § 416.912(e) (emphasis added).  "The evidentiary standard [set forth in this regulation] calls on the Commissioner to recontact a claimant's treating doctors if the medical evidence is *inadequate* for the ALJ to determine disability."  *Madrigal v. Astrue*, No. C 09-04608 RS, 2011 WL 765683, at *7 (N.D. Cal. Feb. 25, 2011) (citations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he requirement for additional information is triggered only when the evidence from the treating medical source is inadequate to make a determination as to the claimant's disability."  ); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("An ALJ is required to recontact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination."); *Tonapatyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, trigger the ALJ's duty to 'conduct an appropriate inquiry.'" (citation omitted)).  In contrast, the duty to recontact is not triggered where the medical record as a whole contains sufficient evidence for the ALJ to make a disability determination, notwithstanding the fact that the treating physician's opinion may lack support.  *See, e.g.*, *Madrigal*, 2011 WL 765683, at *7 ("Here, with support in the record, the ALJ found the evidence was adequate to make a determination regarding [the plaintiff's] disability.  There is nothing that indicates otherwise. Accordingly, the ALJ did not have a duty to recontact [the treating physicians.]"); *Lester v. Astrue*, No. CV 09-7910-JEM, 2010 WL 5348610, at *5 (C.D. Cal. Dec. 21, 2010) (holding that the ALJ had no duty to recontact a treating physician when "[t]he ALJ found [the treating physician's]

1  opinion was lacking in clinical support, but he did not find that the record as a whole was

2  inadequate to reach a decision" as to the plaintiff's disability).

3       So it is here.  In addition to the short questionnaires that Drs. James and Lin completed,

4  Plaintiff's medical record is replete with treatment notes, assessment plans, diagnoses and other

5  material reflecting her condition.  With such support in the record, the ALJ found that the evidence

6  was adequate to make a determination regarding Plaintiff's disability.  What is more, there is no

7  indication in the ALJ's written decision or in the transcript that he found the treating physician's

8  opinions—in general or in regard to particular limitations—to be ambiguous or vague in a way

9  that might trigger the recontact requirement.  Instead, the ALJ merely concluded that the treating

10 physician's ultimate conclusions did not have support in the medical record.  Thus, the ALJ did

11 not have a duty to recontact Drs. James and Lin under Section § 416.912(e).

12              b.    *The ALJ Erred in Weighing the Medical Evidence*

13      Plaintiff next contends that the ALJ erred by according little or no weight to Drs. James

14 and Lin's opinion—that is, the opinions of the treating physicians—and instead giving greater

15 weight to the opinion of the non-examining state consultants, and examining consultant Dr. Calvin

16 Pon, who saw Plaintiff only once.  (Dkt. No. 15 at 12.)  The Court agrees: the ALJ's analysis does

17 not give sufficiently specific reasons for adopting certain of the consulting physicians' opinions

18 instead of the examining or treating physicians.

19      Here, the ALJ discounted the opinions of Drs. James and Lin, the treating physicians,

20 stating:

21          The undersigned gives less weight to the medical source statements
          of Dr. Jason [sic] James, the claimant's surgeon, or Dr. Alice Lin.
22          Both doctors opine that the claimant could be expected to miss at
          least four days of work per month.  However, this extreme limitation
23          is simply unsupported by the claimant's underlying treatment
          records.  Similarly, Dr. Lin provides no support for her opinion that
24          the claimant would require unscheduled rest breaks during the day.
          Although many of Dr. James's restrictions are entirely consistent
25          with those of the [non-examining, consulting] reviewers, the
          positive clinical findings of record do not support a total preclusion
26          from kneeling or crouching.

27 (AR 27.)

28      The ALJ did not provide specific or legitimate reasons supported by substantial evidence

United States District Court
Northern District of California

for rejecting these opinions, as the law requires. *Orn*, 495 F.3d at 632. Notably, the Commissioner repeatedly goes beyond the ALJ's written decision to argue that there are other reasons that the ALJ "could have rejected" the treating physicians' opinions. (Dkt. No. 18 at 14-15.) First, the Commissioner contends that the ALJ could have rejected Dr. James' conclusions because he provided only a conclusory and insufficiently explained "check-box questionnaire" of the type that the Ninth Circuit has deemed to be of little value. (*Id.* (citations omitted).) There is support in case law for such an argument. *See, e.g.*, *Molina*, 674 F.3d at 1111-12 ("We have held that the ALJ may 'permissibly reject[ ] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions." (citation omitted)); *Crane v. Shalala*, 76 F.3d 520, 522 (9th Cir. 1996) (holding that an ALJ may reject check-off forms that do not contain an explanation of the bases for their conclusions). But the ALJ's decision did not so much as mention the form the treating physicians filled out as a basis for rejecting their opinions, and it is well established that "[t]he Court cannot consider arguments not cited or relied on by the ALJ." *Lester*, 2010 WL 5348610, at *4 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)); *see also, e.g.*, *Villareal v. Astrue*, No. C 12-02334 LB, 2013 WL 5372411, at *14 (N.D. Cal. Sept. 25, 2013) ("The court cannot provide post-hoc rationalizations for the ALJ's decision." (citation omitted)). For the same reason, the Court cannot consider the Commissioner's contention that the ALJ could have rejected the treating physicians' recommended limitations due to internal inconsistencies in their reports. (*See* Dkt. No. 18 at 5.) The Commissioner offers several purported inconsistencies, such as Dr. James's opinion that Plaintiff could occasionally squat but never crouch but "one must crouch in order to squat[,]" and Dr. Lin's opinion that Plaintiff could not stoop, crouch, or squat but could sit for four hours per day. (*Id.*) The Court is not persuaded that these opinions are necessarily inconsistent, but it need not decide that issue as the ALJ did not mention these inconsistencies as grounds to reject the treating physicians' opinions. (*See* AR 27.) *See Connett*, 340 F.3d at 874; *Villareal*, 2013 WL 5372411, at *14; *Lester*, 2010 WL 5348610, at *4. Instead, the Court will address each type of limitation and consider the rationale that the ALJ actually used for weighing the medical evidence and rejecting the treating physicians' opinions.

United States District Court
Northern District of California

i.      Four-Day-Month Absence Limitation

With respect to the four-day-a-week absence limitation, the ALJ offered no specific support for his conclusion that this opinion—which both treating physicians reached—was "unsupported by the claimant's underlying treatment records." (*See* AR 27.) Not only did the ALJ not provide specific support for that general contention, but the record evidence indicates otherwise insofar as Plaintiff made multiple trips to her healthcare providers each month. For example, the Court's review of the medical record indicates that Plaintiff attended five medical appointments—including orthopedic consults and physical therapy—in September 2011 and April 2012. Such a record actually supports the treating physicians' conclusion that Plaintiff would need to take time off of work due to her condition, without even accounting for time off due only to pain, which undercut's the ALJ's unsupported, vague contention that this opinion lacked support in the record. Thus, the ALJ erred in failing to provide specific or legitimate reasons supported by substantial evidence for rejecting the treating physicians' opinions that Plaintiff would have four absences per month due to her condition. *See Orn*, 495 F.3d at 632

ii.      Unscheduled Rest Breaks Limitation

The same is true of Dr. Lin's opinion that Plaintiff would need unscheduled rest breaks throughout the day due to pain, which the ALJ rejected on the ground that Dr. Lin "provide[d] no support" for that opinion. (AR 27; *see also* AR 474.) Dr. Lin explained in her questionnaire that Plaintiff would require these 30-minute breaks throughout the day due to "pain/paresthesia" and "adverse effects of medication[.]" (AR 474.) But other than lamenting that Dr. Lin did not provide support for this opinion in the questionnaire, the ALJ did not provide specific reasons, let alone substantial evidence, for rejecting the opinion of this treating physician, and therefore failed to provide the explanation that the law requires. *See Garrison*, 795 F.3d at 1012-13. This is especially true given that none of the examining or consulting physicians commented on the need for breaks throughout the day one way or the other; Dr. Lin's opinion about breaks was therefore uncontradicted, which required the ALJ to provide clear and convincing reasons for rejecting it. *See Ryan*, 528 F.3d at 1198. This the ALJ has not done.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### iii.   Exertional Limitations Regarding Plaintiff's Knee

The ALJ rejected the knee-related exertional limitations of the treating physicians—

namely, those pertaining to kneeling and crouching—to the extent that they were more restrictive

than the examining and consulting physicians' opinions, and by way of explanation wrote that "the

positive clinic findings of record do not support a total preclusion from kneeling or crouching" as

Dr. James concluded.  (AR 27.)  The ALJ did not reference this, but Dr. Lin also opined that

Plaintiff could never crouch (AR 475), which means *both* treating physicians reached the same

conclusion.  And indeed, throughout the record there are notes of physicians and physical

therapists documenting Plaintiff's knee instability, limited range of motion in the knee due to pain,

and ability to bear weight on the right knee only as tolerated.  (*See, e.g.*, AR 401, 430, 436.)

Although the ALJ rejected the treating physicians' knee-related conclusions citing a lack of

support, elsewhere in his analysis he indicates that his adoption of the non-examining reviewers'

opinions was based on three things.

First, the ALJ highlighted that the non-examining, consulting physicians' opinions were

consistent with Dr. Pon's analysis, but the treating physicians' opinions were not.  Dr. Pon noted

that Plaintiff "walked with a stable gait and no cane, and that she could sit comfortably and get on

and off the examination table comfortably" and that she had "4/5 strength in the [ ] right knee

flexors, and . . . could fully extend, but only flex . . . to 110 degrees due to pain."  (AR 27.)  But

Dr. Pon's observation that Plaintiff could walk and sit on the examination table or that she had

"4/5 strength" do not indicate that Plaintiff's knee was stable such that crouching and kneeling

was appropriate; to the contrary, Dr. Pon concluded that Plaintiff's crouching and kneeling should

be limited to occasionally.  (AR 297.)  Thus, Dr. Pon's comment does not provide substantial

evidence for rejecting the treating physician's kneeling and crouching limitations and instead

adopting the non-examining consulting physician's opinions.

The ALJ's second record citation fares no better.  He noted that an August 2012 X-ray

"showed no significant change compared to a July 2011 X-ray."  (AR 27.)  The August 2012 X-

ray indicated that Plaintiff's bone spurs and narrowing in the knee joint had not "progressed," they

remained the same as July 2011—shortly after Plaintiff's second knee surgery—and still reflected

"[d]egenerative joint disease."  (AR 407.)  That Plaintiff's condition had not gotten worse does not mean that the condition improved over that same time period, particularly since Plaintiff asserts that she was disabled due to the knee condition throughout this entire time period, and both treating physicians noted that the limitations they discussed applied since as early as the summer of 2011.  (*See* AR 472, 475.)  Thus, this record evidence does not provide substantial evidence for rejecting the treating physician's opinions about kneeling and crouching and instead adopting the opinions of the consultative physicians.

Finally, the ALJ indicated that he was adopting the reviewing physician's less restrictive exertional limitations over the treating physicians' limitations because a May 2011 treatment note showed that Plaintiff had a full range of motion in her right knee.  (AR 27.)  But a record describing range of motion does not reflect on Plaintiff's ability to bear weight on her right knee, as required when kneeling.  Thus, none of the medical records that the ALJ identifies actually constitute legitimate reasons for adopting the non-examining, consulting physician's opinions about kneeling and crouching at the expense of the treating and examining physicians' analyses.

Importantly, even if they did, the ALJ nonetheless failed to give Drs. James and Lin's opinions about her knee condition the deference that the Code of Federal Regulations requires.  That is, "a treating source opinion, even if inconsistent with other substantial evidence in the record, must be afforded deference and weighed using all the factors listed under 20 C.F.R. § 404.1527."  *Villareal*, 2013 WL 5372411, at *14 (citing SSR 96-2P).  Here, the ALJ did not address the length of the treatment relationship, the frequency of examination, or the nature and extent of the treatment relationship, as is required when an ALJ declines to give a treating physician's opinion controlling weight.  *See Orn*, 495 F.3d at 631.  As such, the ALJ's cursory dismissal of Drs. James' and Lin's opinions about Plaintiff's knee condition was in error.

iv.     Exertional Limitations Regarding Plaintiff's Shoulder

Finally, the ALJ stated that he gave "great weight" to the non-examining, consulting physicians and "significant weight" to consultative examiner Dr. Pon in reaching the conclusion that "the evidence supports a limitation to overhead reaching, but not all reaching, with the right upper extremity[.]"  (AR 27.)  The four physicians that provided opinions in this matter all

United States District Court
Northern District of California

1    differed when it came to Plaintiff's shoulder-related limitations.  Treating physician Dr. James, an

2    orthopedic surgeon, concluded that Plaintiff's right shoulder range of motion was limited to 75

3    degrees in abduction and 100 degrees in flexion, and recommended that pushing or pulling with

4    the right arm and overhead work be limited to occasionally.  (AR 470-471.)  Treating physician

5    Dr. Lin did not discuss Plaintiff's shoulder condition at all in her residual functional capacity

6    questionnaire.  (*See* AR 473-476.)  Examining physician Dr. Pon observed that Plaintiff's shoulder

7    range of motion was limited by pain, but "[i]n spite of her complaint of right shoulder pain,

8    [Plaintiff] should still be able to perform pushing and pulling, right arm/hand control on a frequent

9    basis."  (AR 297.)  However, Dr. Pon opined that "[r]eaching using [Plaintiff's] right shoulder

10   should be limited to occasionally, as there were symptomatic limitations in active [range of

11   movement] of her right shoulder[.]"  (*Id.*)  Of the two non-examining, consultative reviewers, Dr.

12   Chan concluded that Plaintiff could engage in unlimited pushing and pulling but only limited

13   reaching in all directions, including overhead (AR 300), while Dr. Wright concluded that Plaintiff

14   could only engage in limited hand controls with her right upper extremity due to her shoulder

15   injury, and that Plaintiff should be limited to only occasional *overhead* reaching.  (AR 320.)

16        The ALJ adopted the opinion of Dr. Wright—the only doctor to recommend a limitation to

17   overhead reaching only—over all others.  (AR 27.)  It is well established that the opinion of a non-

18   examining doctor alone cannot provide substantial evidence to justify rejecting either a treating or

19   examining physician's opinion, but may be relied on to the extent that independent evidence in the

20   record that supports the opinion.  *See Morgan*, 169 F.3d at 602; *Villareal*, 2013 WL 5372411, at

21   *14.  Here, the ALJ stated that Dr. Wright's opinion was consistent with the record evidence and

22   with Dr. Pon's examination and analysis.  (*Id.*)  As for the record evidence, the ALJ's conclusion

23   that Plaintiff's reaching with the right shoulder need only be limited to occasional in the overhead

24   direction is based, in part, on a 2011 examination in which Plaintiff was "observed to have 4/5

25   right rotator cuff strength, but [was] able to demonstrate forward elevation to 100 degrees."  (AR

26   27; *see also* AR 435.)  But the treating physician in that same medical record also noted that

27   Plaintiff was limited to external rotation to only 45 degrees, observed a tendon tear in her right

28   shoulder, and indicated that shoulder surgery should be performed once Plaintiff's knee surgery

30

1    was completed.  (AR 435-436.)  Thus, this examination cannot be read as substantial evidence that

2    Plaintiff had no problems reaching with her right shoulder.

3          With the elimination of this October 2011 examination, the ALJ's adoption of Dr. Wright's

4    opinion regarding overhead reaching is based only on purported corroboration with the

5    examination and analysis of Dr. Pon.  (AR 27.)  But Dr. Pon's opinion does not support the

6    limitation that Dr. Wright recommended; while Dr. Wright opined that Plaintiff's *overhead*

7    reaching should be limited to occasional, after examining Plaintiff and noting a limited range of

8    movement, Dr. Pon concluded that "[r]eaching using her right shoulder should be limited to

9    occasionally"—all reaching, not overhead reaching only.  (AR 297.)  Dr. Pon's report did not

10   include any language specifying that only *overhead* reaching should be limited.  (*See id.*)  Notably,

11   Dr. Pon's opinion was in narrative form, not checkbox form, so he could have included any details

12   on limitations that he thought appropriate.  In the written decision, the ALJ acknowledged that

13   "[a]lthough Dr. Pon may have intended the same limitation to overhead reaching only, his

14   statement is less specific."  (AR 27.)  And at the hearing, the ALJ candidly admitted that he did

15   not know what Dr. Pon meant in his report—*i.e.*, whether he was "only limiting it to overhead

16   reaching" or reaching in all directions.  (AR 70.)  This distinction is important, as the VE testified

17   that if reaching in all directions was limited to occasional, Plaintiff would not be able to perform

18   any prior relevant work, as all three positions required reaching at frequent.  (AR 69.)

19   Nevertheless, the ALJ's written opinion seems to jump to the conclusion that Dr. Pon must have

20   meant overhead reaching only.  But an ALJ is not permitted to read into a doctor's opinion

21   language and limitations that do not appear.  Thus, Dr. Pon's opinion limiting all reaching to

22   occasional is not consistent with Dr. Wright's recommended limitation of overhead reaching only.

23          Because neither the record evidence the ALJ highlighted nor Dr. Pon's opinion support Dr.

24   Wright's opinion limiting Plaintiff only to *overhead* reaching and not reaching in all directions,

25   the ALJ erred in rejecting the treating and examining physicians' opinions based on the opinion of

26   a non-examining, consulting physician alone.  *See Morgan*, 169 F.3d at 602; *Villareal*, 2013 WL

27   5372411, at *14.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

c.     *Plaintiff's Ability to Ambulate Effectively*

Plaintiff next contends that the ALJ should have utilized the services of a medical expert

pursuant to Social Security Ruling ("SSR") 96-6p to testify about Plaintiff's ability to ambulate

effectively.[23]  (Dkt. No. 15 at 14.)  Although Plaintiff frames this as an issue separate and apart

from the ALJ's weighing of the medical evidence, at bottom it is yet another symptom of the

ALJ's insufficient analysis of the medical opinion evidence.

An ALJ may ask for and consider opinions from medical experts on the nature and severity

of an impairment.  20 C.F.R. § 404.1527(2)(iii).  There are two instances where the opinion of a

medical expert is required:  (1) when equivalence to a listing is at issue at step three of the ALJ's

analysis; and (2) when the record is ambiguous regarding the date of onset of the disability.  *See*

SSR 96-6p (S.S.A.), 1996 WL 374180, at *3-4 (July 2, 1996); *see also* 20 C.F.R. § 404.1527.[24]

Here, the ALJ concluded at step three that Plaintiff did not have an impairment or

combination of impairments that, taken separately or in combination, met or medically equals

Listing 1.02—major joint dysfunction.  (AR 27.)  Plaintiff does not appear to challenge the ALJ's

decision not to call for further medical testimony regarding this listing.  Rather, Plaintiff contends

that the ALJ erred by failing to take testimony from a medical expert concerning Plaintiff's ability

to ambulate effectively after receiving additional, new evidence about that topic—specifically,

treating physician Dr. James's opinion set forth in his questionnaire that Plaintiff could not walk

one block at a reasonable pace on rough or uneven surfaces.[25]  In Plaintiff's view, this comment

---

[23] Social Security Rulings constitute the Social Security Administration's interpretations of the statute it administers and of its own regulations.  *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005).  Although Social Security Rulings do not have the force of law, *Chavez v. Dep't of Health & Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996), once published, they are binding upon ALJs and the Commissioner. *Holohan v. Massanari*, 246 F.3d 1195, 1202-03 n.1 (9th Cir. 2001); *see also Albidrez v. Astrue*, 504 F. Supp. 2d 814, 820 n.7 (C.D. Cal. 2007) (same).

[24] Specifically, the Social Security Ruling provides that an ALJ "must obtain an updated medical opinion from a medical expert . . . [w]hen additional medical evidence is received that in the opinion of the [ALJ] may change the state agency medical or psychological consultant's finding that the impairment is not equivalent in severity to any listed impairment in the Listings of Impairments."  SSR 96-6p (S.S.A.), 1996 WL 374180, at *3-4 (July 2, 1996).

[25] Plaintiff's briefing states that the ALJ erred "by failing to take testimony from a *psychiatric or psychological* expert[,]" but the relevant regulations refer to a "medical or psychological" expert

32

1    renders Plaintiff impaired within the meaning of Listing 1.04—inability to ambulate effectively.

2    (*Id.* at 14-15.)  Put another way, Plaintiff's argument is that the ALJ should have called a medical

3    expert to the administrative hearing to opine about whether Plaintiff's impairment was severe

4    enough to meet Listing 1.04's "inability to ambulate effectively" factor in light of Dr. James's

5    opinion about Plaintiff's inability to walk a block.  (*See id.*)

6        The Commissioner responds that the ALJ "fully considered—and rejected—the more

7    restrictive findings of this questionnaire as inconsistent with Dr. James's own treatment records."

8    (Dkt. No. 18 at 17.)  But the ALJ made no such finding with respect to Dr. James's conclusion

9    about Plaintiff's walking ability; rather, the ALJ only noted that Dr. James's limitations regarding

10   kneeling and crouching did not find support in the record.  (*See* AR 27.)  The Commissioner also

11   contends that the ALJ rejected Dr. James's opinion about Plaintiff's walking ability because of

12   inconsistencies and "obvious inaccuracy" among his opinions over time that demonstrates that Dr.

13   James "became an advocate, and thus was no longer an objective medical source[.]" (Dkt. No. 18

14   at 18 (citation omitted).)  To be sure, an ALJ may reject a doctor's opinion on the grounds that the

15   physician has abandoned an objective medical source role to serve more as a patient's advocate.

16   *See Saelee v. Chater*, 94 F.3d 520, 523 (9th Cir. 1996) (per curiam); *Matney v. Sullivan*, 981 F.2d

17   1016, 1020 (9th Cir. 1992) (an ALJ may reject medical opinion where doctor acts as an advocate

18   in claimant's pursuit of benefits); *see, e.g.*, *Contreras v. Colvin*, No. 1:13-cv-01237-JLT, 2015 WL

19   859626, at *9 (E.D. Cal. Feb. 27, 2015) (citations omitted).  But, as described above, the Court

20   need not consider an argument that the ALJ did not so much as hint at in his decision.  *See*

21   *Connett*, 340 F.3d at 874; *Villareal*, 2013 WL 5372411, at *14; *Lester*, 2010 WL 5348610, at *4.

22        However, the ALJ did consider the record evidence regarding Plaintiff's ability to

23   ambulate effectively, as it relates to Listing 1.02, which he ruled on, in addition to Listing 1.04,

24   which Plaintiff now urges.  Specifically, the ALJ noted Dr. Pon's observation that Plaintiff walked

25   with a stable gait and without an assistive device.  (AR 25-26.)  Indeed, inability to ambulate

26

27   and Plaintiff's argument refers to testimony about one of Plaintiff's purported physical
     impairments, not her mental health.  (Dkt. No. 15 at 4; Dkt. No. 19 at 4.)  Accordingly, the Court
28   does not construe Plaintiff's argument as pertaining at all to psychological or psychological
     impairments or testimony despite her title.

United States District Court
Northern District of California

1   effectively is one of two prerequisites to a finding of major joint dysfunction, in Listing 1.02,

2   which the ALJ considered.  *See* Listing 1.02, 20 C.F.R. Part 404, Appendix 1, Subpart P.  Along

3   with Plaintiff's medical records, Dr. Pon's observation that Plaintiff walked with a stable gait

4   without a cane constitutes a specific and legitimate reason based on substantial evidence for the

5   ALJ's rejection of Dr. James's opinion that Plaintiff could not ambulate effectively.  *Cf. Morgan*,

6   169 F.3d at 602.  But the ALJ's opinion did not address Dr. James's conclusion about Plaintiff's

7   inability to ambulate effectively at step three, and ignoring a medical opinion—or failure to

8   explicitly reject it—is error.  *See Garrison*, 795 F.3d at 1012-13.  It may well be, upon remand,

9   that the ALJ concludes that Dr. James's opinion about Plaintiff's ability to walk merits little

10  weight in light of Dr. Pon's opinion and the rest of the record evidence; however, the ALJ did not

11  even address this particular opinion of Dr. James in his analysis.  This is error, and it renders the

12  Court unable to determine whether the ALJ's analysis squared with SSR 96-6p.

13                                              *  *  *

14          As explained above, the ALJ did not err by failing to recontact Plaintiff's treating

15  physicians, but did err by failing to weigh the medical evidence properly.  These errors were

16  harmful, as they directly informed the ALJ's RFC, the hypotheticals posed to the VE, and the

17  ALJ's ultimate conclusion that Plaintiff was not disabled and could perform her past relevant

18  work.  *See Tommasetti*, 533 F.3d at 1038; *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055

19  (9th Cir. 2006) (defining harmless error as such error that is "inconsequential to the ultimate

20  nondisability determination"); *cf. Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990) (finding

21  ALJ error harmless because it did not affect the result).  The Court therefore remands to the

22  agency with instructions to reconsider Plaintiff's disability determination consistent with the

23  discussion above.

24  **B.      The ALJ Erred in Utilizing Gross Earnings instead of Net Earnings to
            Evaluate Plaintiff's Self-Employment**

25

26          Lastly, Plaintiff contends that the ALJ erred by using Plaintiff's gross earnings, instead of

27  net earnings, to determine whether Plaintiff was engaged in substantial gainful activity during the

28  September 2010 through May 2011 time period at step one of the required analysis.

United States District Court
Northern District of California

Substantial gainful activity is work activity that:  (1) is done, or usually done, for pay or profit, whether or not a profit is realized; and (2) involves doing significant physical or mental activities, taking into account the nature of the work, how well it is performed, whether it is performed under special conditions, self-employment, and time spent working.  *See* 20 C.F.R. §§ 404-1572-404.1573, 416.972-416.973.  Earnings are the "primary consideration" in evaluating whether work activity is substantial and gainful.  20 C.F.R. §§ 404.1574(a)(1), 416.974(a)(1).  Average monthly earnings above a certain threshold "ordinarily" will demonstrate that a claimant has engaged in substantial gainful activity.  20 C.F.R. §§ 404.1574(b), 416.974(b); *see Lewis v. Apfel*, 236 F.3d 503, 515 (9th Cir. 2001) (noting that earnings are "a presumptive, but not conclusive, sign of whether a job is substantial gainful activity).  "Earnings from employment or self-employment count toward average monthly earnings; however, special rules apply to determining 'countable' earnings from self-employment and to evaluating whether self-employment is substantial gainful activity."  *McGlothlin v. Astrue*, No. CV11-10600 AJW, 2012 WL 5512348, at *2 (C.D. Cal. Nov. 14, 2012) (citing 20 C.F.R. §§ 404.1575, 416.975).

For self-employment, Social Security regulations provide that the Administration, and in turn the ALJ, "will not consider [a claimant's] income alone because the amount of income [the claimant] actually receive[s] may depend on a number of different factors[.]"  20 C.F.R. § 416.975(a).  Instead, regulation requires the ALJ to "evaluate [a claimant's] work activity based on the value of [her] services to the business regardless of whether [she] receive[s] an immediate income for [her] services."  *Id.*  Specifically, regulations set forth three different tests for determining whether a claimant has engaged in substantial gainful activity, starting with the first test and considering the others only if the first does not result in a finding of substantial gainful activity.  *Id.*

Under the first test, the ALJ considers whether the claimant "render[s] services that are significant to the operation of the business *and* receive[s] a substantial income from the business."  *Id.* § 416.975(a)(1).  In defining "substantial income," the regulations provide that the administration will "deduct [the claimant's] normal business expenses from [ ] gross income to determine net income" then will deduct work-related expenses.  *Id.* § 416.975(c).  "That part of

1  [the claimant's] income remaining after [the ALJ has] made all applicable deductions represents

2  the actual value of work performed[,]" and that is the amount used to determine if the claimant's

3  self-employment constitutes substantial gainful activity.  *Id.*  The amount is considered to be

4  substantial if it is more than a threshold set forth in 20 C.F.R. § 416.974(b).  If, after applying the

5  first test, the ALJ concludes that the claimant has not engaged in substantial gainful activity, he

6  turns to the second test, which asks whether the claimant's "work activity, in terms of factors such

7  as hours, skills, energy output, efficiency, duties, and responsibilities, is comparable to that of

8  unimpaired individuals in [her] community who are in the same or similar business as their means

9  of livelihood."  *Id.* § 416.975(a)(3).

10      Here, the ALJ concluded that Plaintiff's childcare job constituted substantial gainful

11  activity because her reported gross yearly income of between $32,000 and $42,000 would put her

12  above the $1,640.00 monthly income threshold.  (AR 25.)  The ALJ reached this conclusion

13  notwithstanding Plaintiff's testimony that her net income was zero.  (AR 43.)  The ALJ failed to

14  adhere to the method of calculation set forth in the first regulatory test for determining substantial

15  gainful activity for self-employment, and therefore committed legal error.  *See, e.g.*, *McGlothin*,

16  2012 WL 5512348, at *3 (concluding that the ALJ erred, in part, by failing to differentiate

17  between the plaintiff's gross versus net income for the purposes of determining substantial gainful

18  activity).

19      The Commissioner nonetheless argues that this error is harmless for two reasons.  *See*

20  *Tommasetti*, 533 F.3d at 1038 (for an error to be harmless, it must be "clear from the record that

21  the ALJ's error was inconsequential to the ultimate nondisability determination").  First, the

22  Commissioner contends that the ALJ determined on the basis of substantial evidence in the record

23  at step three that Plaintiff had no severe impairment, so any error in the step one substantial

24  gainful activity analysis is harmless.  But given the errors identified above that call into question

25  the ALJ's weighing of the medical evidence, this argument is unavailing; if the ALJ erred in

26  weighing the medical evidence relied on to create an RFC used to determine whether Plaintiff

27  could work and might have reached a different conclusion at that step after properly weighing the

28  evidence, then the ALJ's conclusion at step one might be material to the ultimate result.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   However, as the Commissioner argues, any error in assessing Plaintiff's income is

2   harmless for a different reason: even if the ALJ had not reached a substantial gainful activity

3   conclusion based on test one (significant services plus substantial income), the ALJ nevertheless

4   would have reached the same conclusion under test two (work activity, including hours and

5   responsibilities) based on the substantial evidence before him.  *See* 20 C.F.R. § 416.975(a)(2).

6   Indeed, even when the ALJ might have erred in considering whether a claimant's earnings created

7   a presumption of substantial gainful activity, where "there is countervailing evidence in the record

8   establishing that her work was substantial[,]" in particular the claimant's own testimony about her

9   work performance and job responsibilities, the ALJ's substantial gainful activity finding

10  nevertheless may be upheld.  *See Thomas v. Astrue*, 359 F. App'x 761, 763 (9th Cir. 2009).  As

11  the ALJ noted, Plaintiff testified that she "worked as a home-base[d] childcare monitor from 2007

12  until May 2011[,]" five days per week for 12 hours each day.  (AR 25.)  This evidence that the

13  ALJ actually identified, along with Plaintiff's testimony that she oversaw five children in the

14  home and was primarily responsible for feeding them meals, and picking up and dropping them

15  off at school, is sufficient to support the ALJ's finding that Plaintiff had engaged in substantial

16  gainful activity.  *See Thomas*, 359 F. App'x at 763.  Thus, the ALJ's legal error in considering

17  Plaintiff's gross earnings from her childcare job instead of her net income was harmless.

### CONCLUSION

19  The ALJ did not err in failing to recontact Plaintiff's treating physicians, and any error in

20  utilizing Plaintiff's gross income instead of net earnings to make a substantial gainful activity

21  determination were harmless given the substantial evidence before the ALJ.  However, the ALJ

22  erred in failing to provide specific, legitimate reasons for discounting certain opinions of Drs.

23  James and Lin, selectively construing the opinion of examining physician Dr. Pon, and instead

24  giving the most credence to the non-examining medical consultants.

25  The Court has discretion to determine whether to reverse or remand a social security case.

26  *Lewin v. Schweiker*, 654 F.2d 631, 635-36 (9th Cir.1981); *Harman v. Apfel,* 211 F.3d 1172, 1178

27  (9th Cir. 2000).  "If additional proceedings can remedy defects in the original administrative

28  proceedings," the case should be remanded.  *Lewin*, 654 F.2d at 635.  Here, remand is warranted

1    because additional proceedings may remedy the defects in the ALJ's analysis.

2           For the foregoing reasons, it is HEREBY ORDERED that Plaintiff's motion for summary

3    judgment (Dkt. No. 15) is GRANTED IN PART and Defendant's cross-motion for summary

4    judgment (Dkt. No. 18) is DENIED.  The Court REMANDS this case to the Commissioner for

5    further proceedings consistent with this order.

6           **IT IS SO ORDERED.**

7    Dated:  April 23, 2015

8

9                                                                 _____

10                                                             JACQUELINE SCOTT CORLEY
                                                                United States Magistrate Judge